# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Randolph Charles Haack,                           Civ. No. 14-1296 (MJD/BRT)

       Plaintiff,

v.

Carolyn W. Colvin,                                **REPORT AND**
Acting Commissioner of                            **RECOMMENDATION**
Social Security,

       Defendant.

---

Randolph Charles Haack, 14346 Hickory Way, Apple Valley, MN 55124, pro se Plaintiff.

Pamela Marentette, Esq., United States Attorney's Office, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Randolph Haack seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits. The parties have filed cross-motions for summary judgment. (Doc. Nos. 6, 7.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied and that Defendant's motion be granted.

# BACKGROUND

## I.   Procedural History

Plaintiff filed an application for disability insurance benefits on June 18, 2009, alleging a disability onset date of January 1, 2009. (Doc. No. 4, Tr. 203–04.)[1] The Social Security Administration ("SSA") denied Plaintiff's claim initially and upon reconsideration. (*Id.* at 96–100, 103–05.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on November 3, 2010, and the ALJ issued an unfavorable decision on December 23, 2010. (*Id.* at 75–88.) Plaintiff timely appealed to the Social Security Appeals Council, which vacated the 2010 ALJ decision and remanded the case to a new ALJ. (*Id.* at 93.) The new ALJ was tasked with obtaining additional evidence of Plaintiff's impairments and residual functional capacity and acquiring supplemental evidence from a vocational expert about the effect of those impairments on Plaintiff's occupational capacity. (*Id.* at 93–94.) On February 16, 2013, the second ALJ issued a decision unfavorable to Plaintiff. (*Id.* at 8–23.) Plaintiff appealed and the Social Security Appeals Council denied Plaintiff's request for review on February 20, 2014. (*Id.* at 1–6.) That denial made the 2013 ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On April 28, 2014, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) The parties thereafter filed cross-motions for summary judgment pursuant to the Local Rules. (Doc. Nos. 6, 7.)

---

[1]      Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 4).

## II.    Factual Background

Plaintiff was born in April 1966. (Tr. 50.) He is married and lives with his wife in a townhome. (*Id.* at 9.) He graduated from high school and attended the required schooling to become an insurance agent. (*Id.*) He completed two years of college courses but discontinued formal schooling due to his grief over the death of his grandfather, stresses, and the effects of his poorly controlled diabetes. (*Id.* at 489.) Plaintiff worked consistently, either in a part-time or full-time capacity, from August 1994 to June 2009, including six months of part-time work following the alleged disability onset date. (*Id.* at 13, 274.) He worked full-time as a hotel night auditor for almost twelve years, and during many of those years he also worked part-time as a retail clerk at Best Buy. (*Id.* at 274.) From 2007 to 2009, Plaintiff worked as a part-time insurance agent. (*Id.*) Plaintiff was forty-two years old on his alleged disability onset date of January 1, 2009. (Tr. 50.) Plaintiff alleges that he is disabled due to chronic neck pain, bilateral carpal tunnel syndrome, adhesive capsulitis,[2] obesity, Type I and Type II diabetes mellitus, diabetic retinopathy, depression, and social phobia. (*Id.* at 30–41, 314–16.)

---

[2]    Adhesive capsulitis is also known as "frozen shoulder"; its symptoms are pain and stiffness in the affected shoulder joint, and its treatment typically involves physical therapy and cortisol shots or numbing agents to the affected area, but it can require surgery in severe cases. Adhesive capsulitis can be diagnosed solely from signs and symptoms, but MRI or x-ray imaging can rule out other causes. Symptoms usually worsen over time, but then eventually resolve, often within one to three years. *See Diseases and Conditions: Frozen Shoulder*, Mayo Clinic (Mar. 10, 2015), http://www.mayoclinic.org/diseases-conditions/frozen-shoulder/basics/definition/con-20022510.

### A.  Medical History

#### i.    Neck and Shoulder Pain

On June 13, 2005, Plaintiff was involved in a car accident, which resulted in compression fractures at the T3 and T4 vertebrae and chronic pain in his neck, right shoulder, and upper back. (*Id.* at 314, 350.) He also had a history of radial nerve displacement from 1989. (*Id.* at 539.) Years later, in May 2008, Plaintiff went to a chiropractor complaining of persistent neck and upper back pain. (*Id.* at 410.) A subsequent MRI showed evidence of old compression fractures at T3 and T4 and mild cervical and upper thoracic spondylosis with no herniation. (*Id.* at 394.) Plaintiff was prescribed Lyrica and physical therapy, but discontinued physical therapy because it purportedly was too painful. (*Id.* at 401–02, 405.)  In January 2009, Dr. Andrew J. Will, a doctor at the Twin Cities Pain Clinic, opined that Plaintiff had exhausted conservative methods of treating his neck pain. (*Id.* at 399.) Between March and June of 2009, the Twin Cities Pain Clinic adjusted Plaintiff's medication and administered an epidural steroid injection, which seemed to lessen the severity of Plaintiff's pain. (*See id.* at 414–36.) Plaintiff continued to manage his neck pain with varied medications throughout 2009 and 2010. (*Id.* at 530–32.) By August 2010, Plaintiff reported improved functioning in his neck with medication. (*Id.* at 534.)

In May 2012, Plaintiff was referred to Dr. John Noll, a doctor of osteopathic medicine at Fairview Sports and Orthopedic Center, for pain in his left shoulder and upper arm. At that time, Plaintiff stated he was unsure of when the pain had started, but that it had lasted over a year; he had not, however, sought treatment or diagnosis before

4

seeing Dr. Noll. (*Id.* at 551–52.) Dr. Noll had difficultly assessing a specific cause, but diagnosed the pain as adhesive capsulitis and recommended cortisone injection and physical therapy. (*Id.*) Plaintiff received a steroid injection of lidocaine and kenalog within a week of Dr. Noll's diagnosis. Immediately following the procedure, Plaintiff reported his pain reduced to a four out of ten. (*Id.* at 550.) There is no evidence in the record indicating whether Plaintiff had any additional treatment or follow-up for the adhesive capsulitis.

### ii. Diabetes

Plaintiff was diagnosed with diabetes in December 1978. (Compl. ¶ 7.) Specifically, he suffers from uncontrolled, insulin-dependent diabetes mellitus, and has been diagnosed with diabetic retinopathy. (Tr. 365.) Plaintiff had corrective eye surgery in response to the diabetic retinopathy and, as of November 2009, both his vision and diabetic retinopathy were stable. (*Id.* at 365, 530.) Medical records from 2008 to 2010, however, show sporadic self-management of his diabetes. (*See id.* at 385, 388, 460, 461, 517, 520.)

### iii. Carpal Tunnel Syndrome

Plaintiff states that he was diagnosed with bilateral carpal tunnel syndrome ("CTS") in 1994 and was then told that there was no treatment for CTS available to him because of his diabetes. (Compl. ¶ 6; Tr. 32.) There is no medical evidence in the record of a CTS diagnosis or treatment plan. (*Id.* at 14.) The only references to CTS in the medical record are in Plaintiff's self-reported past medical history. (*See id.* at 466, 489, 539.)

### iv.    Mental Health Issues

Plaintiff reported that he underwent a brief period of mental health care in 1986

when his grandfather passed away. (*Id.* at 539.) In December 2008, Plaintiff spoke with a

regular physician about anxiety resulting from chronic neck pain. (*Id.* at 376.) Later, in a

November 2009 Psychological Report, Robert Lopno II, a licensed psychologist,

diagnosed Plaintiff as suffering from social phobia and mood disorder, with depressive

features due to chronic neck pain and diabetes. Plaintiff reported that his neck pain flared

two to three times a week due to stress and activity. He presented as alert and fully

oriented, and his GAF score was 52.[3] (*Id.* at 490.) Lopno stated that Plaintiff's

psychological status did not preclude him from work in at least an entry-level job. (*Id.*)

Also in November 2009, a Psychiatric Review of Plaintiff by Ray M. Conroe, Ph.D.,

L.P., found no functional limitations that were marked or extreme; all limitations ranged

from nonexistent to moderate. (*Id.* at 506.) Dr. Conroe noted that Plaintiff had exhibited

suicidal thoughts on a daily basis without intent or plan, that Plaintiff's sleep and appetite

varied with his pain level, and that his mental health issues did not meet or exceed the

---

[3]    The Global Assessment of Functioning Scale (GAF), a scale of 0 to 100, is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults. *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-tr*) 32 (American Psychiatric Association 4th ed. text revision 2000). Scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 34. Scores between 41 and 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* The GAF scale was excluded from the latest edition of the DSM. *See DSM-V* (American Psychiatric Association 5th ed. 2013).

12.00 listings of mental disorders that rise to the level of severe impairment under the Social Security regulations.[4] (*Id.* at 508.)

In March 2010, Plaintiff again presented as alert and oriented when seen by Georgia Panopoulos, Ph.D., L.P., at the Twin Cities Pain Clinic. Although his tone was flat and he seemed to minimize his depression, Dr. Panopoulos found Plaintiff to be pleasant, with his memory, speech, attention, and concentration normal and intact. (*Id.* at 540.) He was diagnosed with pain disorder associated with psychological features and general medical condition, as well as adjustment disorder with depressed mood and insomnia. His GAF score was in the 50–55 range. (*Id.* at 541.) At that time, Plaintiff informed Dr. Panopoulos that he was uninterested in antidepressants and felt his depression had improved in the preceding few weeks. (*Id.* at 540.)

### B.  Functional Reports

As part of his application for disability benefits, Plaintiff completed a functional report for the Social Security Administration. (*Id.* at 285–92.) Although undated, that report was written while Plaintiff was an insurance agent, most likely in the spring of 2009. (*See id.* at 75, 274, 285.) Plaintiff reported that he had a 35 to 45 minute commute to work, that he worked 3 to 5 hours as pain permitted, and that work as an insurance agent involved writing and using the phone and computer. (*Id.* at 285.) Plaintiff prepared or assisted with making most meals, helped with household chores, and ran errands. (*Id.*

---

[4]      *See* 20 C.F.R. Part 404, Subpart P, App. 1 providing information on the 12.00 listings).

at 287–88.) Plaintiff stated that he enjoyed reading, watching T.V., gaming on the computer, and participating in role-playing games with friends, such as Dungeons and Dragons. (*Id.* at 289.) He stated that he had some difficulty getting along with others because his pain made him irritable and depressed. (*Id.* at 290.) Plaintiff also indicated he had difficulty lifting anything heavier than five pounds, and could walk no more than a mile and no longer than fifteen minutes before requiring rest. (*Id.*)

In an updated functional report dated October 22, 2009, Plaintiff reported that he spent his days watching T.V., reading, using the computer, and that he participated in role-playing games with friends on a semi-regular basis. (*Id.* at 258, 262.) Except for watching T.V., Plaintiff indicated all of his hobbies were dependent upon his pain level. (*Id.*) He stated he could care for his own hygiene, though it sometimes intensified his pain level. (*Id.* at 259.) He prepared his own simple meals daily, and he assisted with small household chores (dusting, dishes) a few times a week. (*Id.* at 260.) He was able to drive himself short distances without an increase of pain, and he went to the store once a week for groceries and books. (*Id.* at 261.) Plaintiff reported that he could not lift more than ten pounds and that he had trouble with stairs and walking for more than ten minutes. (*Id.* at 262.) He stated that he did not handle stress or change well, and that an increase in pain made him irritable and unsociable. (*Id.* at 262–63.)

On October 23, 2009, Plaintiff's wife completed a third-party functional report, stating that her husband had difficulty sleeping for more than three hours at a time. (*Id.* at 267.) She also stated that Plaintiff watched T.V., used the computer, cooked, read, played

role-playing games, and helped with dusting, dishes, and the garbage. (*Id.* at 268, 270, 273.)

### C. Testimony at the Administrative Law Hearings

#### i. Plaintiff's Testimony

##### 1. 2010 Hearing

Plaintiff testified at the November 3, 2010 hearing and provided information about his background. (*Id.* at 50–52.) He stated that he experienced an onset of severe pain in March 2008, but that he chose January 2009 as his alleged onset date because that is when he began making less than the threshold required for substantial gainful activity. (*Id.* at 47–48.) Plaintiff testified that he terminated his employment at Best Buy as a retail clerk and as an insurance agent in June 2009 because Best Buy would not allow him to extend his medical leave and he was unable to perform his job as an insurance agent. (*Id.* at 48.) He had not worked since June 2009. (*Id.* at 52.)

Plaintiff explained that the stress of his job and his commute caused his pain to "spike," and that answering or holding the phone at work was painful. (*Id.* at 49–50.) In addition, he could comfortably drive for no more than ten minutes, however, he met his mother approximately once a week to go grocery shopping, and visited his mother's home—which is 40 miles away—once a month. (*Id.* at 51–52, 62.) Plaintiff also played games on his computer for one to three hours a night. (*Id.* at 59.)

Plaintiff testified that he is an insulin-dependent diabetic with CTS, diabetic retinopathy, and neck pain. (*Id.* at 53.) He had surgery for radial nerve displacement in 1989 and his glasses counteracted his retinopathy, but he was told he could not have

surgery for the CTS because of his diabetes. (*Id.* at 53.) He saw Dr. Jeffrey Michell of

Fairview Cedar Ridge Clinic for his diabetes and Dr. Andrew Will for his pain. (*Id.* at

54.) Without pain medication, Plaintiff rated his pain level as 9 out of 10; with

medication, his pain level was at 7. He stated that he began taking morphine sulfate,

Lyrica, tramadol, and cyclobenzaprine in May 2008 for pain relief. (*Id.* at 55–56.) He

also described his pain as constant with an ebb and flow of intensity depending on stress

and physical exertion. (*Id.* at 56.) Plaintiff also testified that turning his head, carrying

heavy items, or walking more than twenty minutes caused an increase in pain, and

prolonged computer usage caused his carpal tunnel to flare up. (*Id.* at 57–58.) In addition,

Plaintiff expressed a fear of talking with strangers; as an insurance agent he had other

agents talk with clients, and while employed at Best Buy he worked primarily in the

backroom, away from customers. (*Id.* at 64–65.)

### 2.  2013 Hearing

On January 30, 2013, Plaintiff testified at a second hearing before a different ALJ.

(*Id.* at 30–41.) Much of his testimony mirrored what he said at the earlier administrative

hearing held in 2010. But he also reported that stress exacerbated his neck pain, that

nerve blocks had not had much effect on limiting the pain, and that he stopped taking

Lyrica and morphine because he could not afford to go to the doctor to have them

prescribed. (*Id.* at 32–33.) Plaintiff stated that he took naproxen sodium and underwent

some physical therapy from May through November 2012 for his left shoulder pain. (*Id.*

at 36.) He said he could walk a quarter of a mile without incident, stand for up to a half

hour, and had no difficulty with sitting. (*Id.* at 33.) He had limited range of motion in his

left arm, and his computer usage and cooking ability was limited by carpal tunnel. (*Id.* at 34.) Plaintiff said that he slept for two to five hours every twenty-four to forty hours and slept through his pain only when exhausted. (*Id.* at 35.)

### ii.  Vocational Experts' Testimony

#### 1.  2010 Hearing

Bill Rutenbeck, a vocational expert, testified at the 2010 hearing. (*Id.* at 65–70.) The ALJ posed hypothetical questions to Rutenbeck about a hypothetical person of Plaintiff's age, education, and work experience who had the following limitations: lifting fifty pounds on occasion and twenty-five pounds frequently; sitting, standing, or walking for six hours per workday; never climbing ladders or scaffolds; frequently climbing ramps or stairs, stooping, crouching, crawling, or kneeling; occasionally rotating his neck and reaching; and avoiding concentrated exposure to cold. Additionally, the hypothetical person would be required to do only simple tasks in a reduced stress environment where he would have limited interaction with coworkers or the public. (*Id.* 66–67.) Rutenbeck testified that such a person would be unable to do Plaintiff's former work as an insurance agent or hotel desk clerk, but could perform other work in the national economy, such as a housekeeper, cafeteria attendant, or office helper. (*Id.* at 67–68.) Rutenbeck also stated that his conclusion would not change if the hypothetical person was further limited to only light level work and occasionally climbing ramps or stairs. (*Id.* at 68.) And, in response to Plaintiff's counsel's question about a further limitation of occasional handling or reaching, Rutenbeck testified that these positions would be precluded. (*Id.* at 69.)

The ALJ further inquired, asking whether a second hypothetical person with a sedentary level of exertion would be able to work. (*Id.* at 68.) Rutenbeck testified that there were several positions available in the regional economy for such a person, including optimal assembly and inspector electronic. (*Id.*) These jobs would, however, be precluded by the further restriction of only occasional bilateral handling. (*Id.* at 69.)

### 2. 2013 Hearing

Ken Ogren testified as the vocational expert at the 2013 hearing. (*Id.* at 38–40.) The ALJ posed a hypothetical question, asking the vocational expert whether a younger person who is limited to light level work; is unable to work at unprotected heights, reach overhead, work around exposed moving machinery, power grip with either hand, or continuously rotate his neck; can manage frequent but not continuous handling; and whose proposed job should only require them to either sit and/or stand for six hours out of an eight-hour work day, or stand and/or walk for six out of eight hours, would be able to perform any of Plaintiff's past work as a night auditor, insurance agent, or retail clerk. (*Id.* at 38–39.) Ogren opined that such a person would be able to work as a night auditor or a retail clerk. He eliminated the insurance agent position because it might require climbing ladders. (*Id.* at 39.) Ogren also stated that there were other jobs in the regional economy that such a person would be able to perform, including working as a "stuffer." (*Id.*) When asked by Plaintiff's counsel whether Plaintiff's reaching issues would preclude any of the three proposed jobs, Ogren testified that they would not. (*Id.* at 40.)

### iii.  Medical Expert's Testimony

Dr. Horzenacki testified as a medical expert at the 2013 hearing. (*Id.* at 36–38.) He testified that Plaintiff suffered from chronic neck, headache, and upper back pain; old compression fractures in the thoracic spine; degenerative joint disease; insulin-dependent diabetes; diabetic retinopathy; and obesity. (*Id.* at 36.) Dr. Horzenacki testified that the retinopathy was corrected by lenses. (*Id.* at 37.) Also, with regard to Plaintiff's alleged CTS, Dr. Horzenacki testified that there was an absence of "any physical exam corroboration or EMG [electromyography] corroboration in the medical record." (*Id.*) Additionally, he pointed out that there were no imaging studies done with respect to Plaintiff's adhesive capsulitis diagnosis, and that the impairment had not persisted for more than twelve months at the time of the hearing. (*Id.*) Dr. Horzenacki testified that due to Plaintiff's impairments, he should be restricted to a light level of exertion with no overhead reaching, no climbing ladders or scaffolds, no power gripping, no exposure to workplace hazards, and frequent but not continuous handling and rotation of the neck. (*Id.*)

## III.  ALJ's Findings and 2013 Decision

On February 16, 2013, the ALJ issued a decision denying Plaintiff's application for disability benefits, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at 8–23.) The ALJ followed the five-step evaluation process dictated by 20 C.F.R. § 404.1520(a)(4), which involves the following determinations: (1) whether Plaintiff is involved in "substantial gainful activity"; (2) whether Plaintiff has a severe impairment that significantly limits his mental or physical ability to work; (3) whether

Plaintiff's impairments meet or equal a presumptively disabling impairment listed in the

regulations; (4) whether Plaintiff has the residual functional capacity to perform his past

work; and (5) if Plaintiff cannot perform his past work, whether the government has

shown that Plaintiff can perform other work, and that there is a sufficient number of those

jobs available in the national economy. *See Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir.

1998).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since his alleged onset date of January 1, 2009. (Tr. 13.) At step two, the ALJ

determined that Plaintiff had the following severe impairments: chronic neck pain, upper

back pain, and headaches resulting from T3 and T4 fractures and degenerative disc

disease; insulin-dependent diabetes; and obesity. (*Id.* (citing 20 C.F.R. § 404.1520(c))).

The ALJ found insufficient evidence to support a finding that Plaintiff's CTS, diabetic

retinopathy, mental health issues, and adhesive capsulitis were severe impairments "given

the brief and conservative nature of treatment and the lack of signs and symptoms to

support significant limitations in the ability to engage in basic work activities for a

requisite 12 months." (*Id.* at 14.) The ALJ noted that Plaintiff did not seek any workup or

treatment for CTS or adhesive capsulitis, that there was "no supportive diagnostic

evidence to support a diagnosis" of CTS, and that Dr. Noll's diagnosis of adhesive

capsulitis was "not supported with imaging studies" or evidence to support "the 12-month

durational requirement." (*Id.* at 14–15.) The ALJ also found that Plaintiff's medically

determinable mental conditions of pain disorder, adjustment disorder, and social phobia

did not cause more than a minimal limitation on his ability to perform basic work

14

activities. (*Id.* at 15–16.) The ALJ concluded that Plaintiff had mild limitation in daily living as he was able to maintain a relatively independent lifestyle. (*Id.*) Likewise, the ALJ found that Plaintiff had a mild limitation in social function and concentration, persistence, or pace, as he regularly enjoyed spending time with his friends, ran errands by himself, and had no difficulty remembering to take his medication. (*Id.* at 16.) The ALJ further noted that Plaintiff had no history of decompensation. (*Id.*) As such, the ALJ determined Plaintiff's mental impairments were not severe. (*Id.*)

At step three of the evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16.) At step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") "to perform light work as defined in 20 C.F.R. 404.1567(b), avoiding overhead work, unprotected heights, climbing of ladders, ropes and scaffolds, dangerous exposed moving machinery, and power gripping, and allowing for frequent, but not continuous handling and neck rotations." (*Id.* at 17.) In making the RFC determination, the ALJ found that the objective medical evidence did not support Plaintiff's alleged level of restriction. (*Id.* at 18.) While the ALJ found that Plaintiff would be in some level of pain due to the injuries he sustained in the 2005 car accident, inconsistencies in the record did not corroborate "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms." (*Id.*) The ALJ made this determination using the factors outlined in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). (Tr. 17.)

The ALJ found that Plaintiff's overall functioning did not support disability, in part because Plaintiff was largely independent in his personal care, he regularly spent time with friends and family, and he helped his wife around the house. (*Id.* at 21.) The ALJ did not afford great weight to Dr. Lopno's findings regarding Plaintiff's mental impairments. (*Id.* at 15.) In addition, the ALJ found a pattern of noncompliance with treatment in the record, specifically regarding Plaintiff's diabetes and pain management. (*Id.* at 20–21.)

Ultimately, at step four of the disability determination process, the ALJ credited the testimony of vocational expert Ogren and found that Plaintiff was capable of performing his past relevant work, specifically as a night auditor and retail clerk. (*Id.* at 21.) The ALJ alternatively found that there were other jobs in the national economy that Plaintiff was also capable of performing. (*Id.* at 22.) Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Social Security Act, from January 1, 2009, through the date of the ALJ's decision. (*Id.* at 23.)

## DISCUSSION

### I.      Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if

his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

This Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F. 3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F. 3d at 536. "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Social Sec. Admin.*, 734 F. Supp. 2d 773. 799 (D. Minn. 2010) (citations omitted). This test requires more than "a mere search of the record for evidence supporting the findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court may not substitute its own opinion for that of the ALJ's, even if the Court would have reached a conclusion different from that of the fact-finder. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  "Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo." *Bauer*, 734 F. Supp. 2d at 800.

The claimant bears the burden of proving that he is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

## II.        Analysis of ALJ's Decision

Plaintiff raises several arguments challenging the 2013 ALJ's decision. He claims that the ALJ was not a competent and impartial fact-finder, that the ALJ erred by finding that he did not have any severe impairments that met the severity of a listed impairment under 20 C.F.R. § 404.1520, and that the ALJ erred by relying on the testimony of a vocational expert and finding that Plaintiff was capable of some work. (Doc. No. 6, Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") 2–4.) As discussed below, Plaintiff has not met his burden of proving he is unable to perform past relevant work.

### A.  ALJ as Acceptable Decision-Maker

Congress grants the Commissioner of Social Security "full power and authority to make rules and regulations and to establish procedures." 42 U.S.C. § 405(a). The Commissioner is also charged as the decision maker and finder of fact in determining social security disability rights. 42 U.S.C. § 405(b)(1). If a social security disability claimant is dissatisfied with the final determination made by the SSA and Commissioner, he can request a hearing and an ALJ will be appointed to conduct that hearing. 20 C.F.R.

18

§ 404.929. In these hearings, "[t]he ALJ is responsible for deciding questions of fact, including the credibility of a claimant's subjective testimony about her limitations." *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (citing *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003)). Numerous courts at every federal level have found ALJs to be sufficient fact-finders in social security disability cases. *See, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 117 (2000) (detailing that the ALJ's role in a social security case is to "investigate the facts"); *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (finding that the "ALJ is responsible for deciding questions of fact"); *Winstrom v. Halter*, 168 F. Supp. 2d 1032, 1038 (D. Minn. 2001) (finding that "deference is to be given to the findings of the ALJ so long as those findings are based on substantial evidence in the record as a whole").

Plaintiff argues that the 2013 ALJ was biased in his decision. Specifically, he asserts that the ALJ made assumptions of fact (regarding his sugar intake and his contributions to household finances) and belittled his term for social anxiety ("stage fright"), which made Plaintiff "question [the ALJ's] impartialness in the handling of [his] case." (Compl. ¶¶ 9–10; Pl.'s Mot. 4.) In order for a plaintiff to prove that an ALJ exhibited unacceptable bias towards him, he is "required to show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir. 2011) (quoting *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (detailing that the Supreme Court, in *Liteky v. United States*, 510 U.S. 540, 551 (1994), established a standard for determining a judge's bias)). "There is a 'presumption of honesty and integrity in those serving as adjudicators.'" *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Withrow v.*

19

*Larkin*, 421 U.S. 35, 47 (1975)) (finding that Plaintiff's claim was comprised "entirely of unsupported allegations based on the ALJ's decision itself," and thus was unfounded).

Here, the ALJ's actions taken as a whole do not indicate an inability to render fair judgment. Even if the ALJ was insensitive in his response to Plaintiff's use of the phrase "stage fright," sarcastic comments "are within the bounds of what imperfect men and women sometimes display" and do not indicate bias. *Perkins*, 648 F.3d at 903 (quoting *Rollins*, 261 F.3d at 858). Further, any possible mistakes of fact that the ALJ made (such as assuming Plaintiff drank sugared soda[5] or mistakenly asserting that Plaintiff managed the household finances) are—at most—harmless error. *See, e.g.*, *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (finding that an ALJ's mistake of fact in regard to the record is harmless error when "[t]here is no indication that the ALJ would have decided differently" had there been no mistake); *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal.").

---

[5]    Plaintiff objected to the ALJ's assumption that Plaintiff's soda pop intake of 3–12 pops per day (*see* Tr. 540) indicated that Plaintiff was drinking 3–12 sugared drinks a day. (Compl. ¶ 10.) Plaintiff contends that he was drinking diet sodas with no carbohydrates, thus the soda intake should not affect his diabetes. The ALJ, however, seemed concerned not only with the possible sugar intake of the sodas, but with the caffeine consumption related to the sodas, especially considering Plaintiff's complaints of chronic sleep struggles. (Tr. 21.)

## B.  Severity of Plaintiff's Impairments

The ALJ found that Plaintiff had severe impairments of chronic neck and upper back pain, insulin-dependent diabetes, and obesity, and these impairments caused only minimal limitations in Plaintiff's ability to perform basic work activities. (Tr. 13–14; 16–17.) The ALJ also determined Plaintiff's alleged CTS, adhesive capsulitis, and mental health issues did not qualify as severe impairments. (*Id.* at 14–15.) In making this determination, the ALJ considered the treatment and non-treatment of Plaintiff's alleged impairments, the objective medical evidence, and Plaintiff's overall functioning. (*Id.* at 14.)

Specifically, the ALJ considered that there was no evidence in the record of a CTS diagnosis or treatment beyond Plaintiff's self-reported history when he determined Plaintiff's CTS was not severe. (*Id.* at 14.) This conclusion was reasonable. *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (finding that substantial evidence supported ALJ's finding that carpal tunnel syndrome was not severe because any evidence supporting such impairment was dated well before the disability onset date and the medical record did "not establish any work-related limitations as a result of this impairment").

In considering Plaintiff's adhesive capsulitis diagnosis, the ALJ noted the lack of imaging studies for the diagnosis and the lack of treatment (other than a single cortisone shot in 2010), and found that the adhesive capsulitis failed to meet the twelve-month

durational requirement necessary for disability.[6] (Tr. 14–15.) An ALJ may consider lack of regular treatment in determining whether a plaintiff's impairments are severe. *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995). Plaintiff objects to the ALJ's finding that imaging studies were necessary, and asserts that his treating physician, Dr. Noll, made the correct diagnosis. (Compl. ¶ 7.) Although treating physicians are usually afforded controlling weight in social security disability cases, an ALJ may take into account the opinions of all physicians, especially when the treating physician's opinions are not supported by substantial evidence or accepted practices in the medical field. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). Here, the ALJ credited the medical expert's testimony that imaging and treatment for adhesive capsulitis would have been appropriate had the impairment been severe, and the ALJ relied on that testimony in finding that Plaintiff's alleged adhesive capsulitis was not a severe impairment. (Tr. 14–15, 18.)

Regarding Plaintiff's alleged mental health issues, the ALJ found, based on a review of the evidence before him, that Plaintiff had not received regular mental health care, which would have objectively substantiated Plaintiff's claims that his mental health issues were a severe impairment.[7] (*Id.* at 21.) This lack of regular care, coupled with the

---

[6]     An impairment must last for twelve months or be expected to last for at least twelve months in order to qualify an applicant for social security disability benefits. 42 U.S.C. § 423(d)(1)(A).

[7]     In making this determination, the ALJ did not afford great weight to the opinion of Psychologist Lopno, a psychologist who had treated Plaintiff, due to the absence of ongoing mental health care evidence in the record. (Tr. 15.)

fact that Plaintiff had declined treatment and medication for his alleged stress, depression, and insomnia, which might have improved any limitation on Plaintiff's functioning, led the ALJ to conclude that Plaintiff's mental health issues did not rise to the level of severe impairment. (*Id.*) Where a plaintiff does not seek more than limited treatment for mental health issues, it is reasonable for an ALJ to find that those issues are not severe impairments.[8] *Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007); *see also Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011); *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).

In addition, an ALJ is allowed to consider a plaintiff's functioning in determining whether his impairments are severe. *See Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two [severe impairment].").  Here, the ALJ's conclusion that Plaintiff's overall functioning supported a finding that his impairments were not severe is supported by the record; Plaintiff reported he was largely independent in caring for himself, he was able to leave the house to run errands, and he enjoyed spending time with his friends and family. (Tr. 21.)

In sum, the ALJ considered the brief and conservative nature of treatment for the alleged impairments, the lack of objective medical evidence to support a finding of severe

---

[8]     Additionally, the lack of treatment or medication for Plaintiff's mental health issues does not support his claims of social phobia. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (finding that the plaintiff's allegations of social anxiety were not credible when the plaintiff did not receive psychological treatment or medications and "his daily activities were not indicative of intense fears of crowds or people").

impairment for Plaintiff's adhesive capsulitis, CTS, and mental health issues, and Plaintiff's overall functioning to find that although Plaintiff had some severe impairments, these particular impairments did not rise to the level of severity necessary to find Plaintiff disabled under 20 C.F.R. § 404.1520(d). (Tr. 13–16.) The ALJ's conclusion in this regard is supported by substantial evidence in the record.

### C. ALJ's Finding that Plaintiff is Capable of Work

Plaintiff argues that the ALJ erred in step four of the social security disability analysis by finding that he is capable of performing several of his past jobs. (Pl.'s Mot. 2–4.) In making this determination, the ALJ relied on the testimony of vocational expert Ken Ogren to ascertain what jobs were precluded by Plaintiff's impairments. (Tr. 21–23.) Plaintiff argues that the ALJ improperly relied on the vocational expert's testimony and that the ALJ should have found Plaintiff credible in his claim that he is incapable of all work. (Pl.'s Mot. 4.)

### i.    Reliance on the Vocational Expert's Testimony

Plaintiff alleges that the vocational expert's testimony was inappropriate because he did not take medical testimony into account and because the vocational experts (from the 2010 hearing and the 2013 hearing) offered conflicting testimony.[9] (Doc. No. 6, Pl.'s Mot. 4.) These arguments fail.

---

[9]    Plaintiff also argues that vocational experts are not impartial witnesses as their "continued employment is at the discretion of the Social Security Administration." (Pl.'s Mot. 4.) A vocational expert, though paid by the SSA, is not an agent of the SSA. An expert's compensation is not dependent upon his or her testimony and the SSA tasks vocational experts with remaining objective and impartial. *See* Social Security

(Footnote Continued on Next Page)

An ALJ's reliance upon a vocational expert's testimony is permissible in instances where the fact finder must address a complex vocational issue, such as determining the availability of alternative jobs in the national economy or whether Plaintiff's ability and skills are transferable to another. *See* 20 C.F.R. § 404.1566(e). While not medical experts, vocational expert testimony constitutes substantial evidence in a social security disability case when that testimony is founded on proper hypothetical questions posited by the ALJ. The hypothetical questions should consider all of Plaintiff's impairments that an ALJ has determined to be credible and true. *See Gorton v. Astrue*, No. 06-CV-4903, 2008 WL 583701, at *29 (D. Minn. Feb. 28, 2008) (quoting *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996)) ("Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence.").

Plaintiff contends that the ALJ erred by not including his alleged CTS in the hypothetical posed to the vocational experts. (Pl.'s Mot. 4.) A vocational expert's testimony need only consider the impairments the ALJ has deemed credible. Here, the ALJ did not find Plaintiff's claims of bilateral carpal tunnel syndrome to be credible.[10] And because it was proper for the ALJ to conclude Plaintiff's CTS (and adhesive capsulitis and mental health issues) was not severe, it was not necessary to include the

---

(Footnote Continued from Previous Page)
Administration, *Vocational Expert Handbook* 8–9 (2011), *available at* http://www.socialsecurity.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf.

[10]     *See* Discussion Part II.B.

impairment in the hypothetical. Thus, the vocational expert relied on all necessary limitations and his testimony constitutes substantial evidence. [11] *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217–18 (9th Cir. 2005) (finding that the ALJ's reliance on the vocational expert's testimony was proper when the "hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record").

Finally, although the vocational experts proposed differing occupations, the occupations are not in conflict with each other. The suggestions were made at two separate hearings, in response to different hypothetical questions. Each vocational expert was able to suggest at least one sample occupation which Plaintiff should be able to perform. [12] The occupations suggested by the vocational experts in the 2010 and the 2013 hearings are not, therefore, in conflict with each other.

### ii.     Plaintiff's Credibility

The ALJ found there was insufficient objective evidence to support Plaintiff's claims for disability, and concluded that although Plaintiff would reasonably suffer some pain, he would not suffer debilitating pain, and thus he was capable of work. (Tr. 17–21.)

---

[11]     Furthermore, Ken Ogren, the vocational expert in the 2013 hearing considered a limitation of frequent, but not continuous handling, and in his opinion a hypothetical person in Plaintiff's position would be able to perform his past jobs as a night auditor or retail clerk. (Tr. 38–40.)

[12]     Proposed occupations included optimal assembly, inspector electronic, and stuffer. *See supra* Background Part II.C.ii.

Plaintiff contends that the ALJ erred in concluding that he was not credible in his claim that he was incapable of all work. (Pl.'s Mot. 2–4.)

An "ALJ may not discount subjective complaints solely because they are not supported by objective medical evidence." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008). Instead, when a plaintiff's statements pertaining to the intensity, persistence, or functionally mitigating effects of pain or other symptoms are not supported by objective medical evidence, the ALJ must consider the credibility of the statements, taking into consideration the record as a whole.[13] Specifically, the ALJ must consider the *Polaski* factors in determining a claimant's credibility. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009). Under *Polaski*, in the absence of objective medical evidence supporting a claimant's subjective complaints, the fact-finder should consider the claimant's prior work record, observations by third parties, and treating or examining physicians, relating to: (1) claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and

---

[13]     The Social Security Act warns that "statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." 20 C.F.R. § 416.929.

aggravating factors; (4) dosage, effectiveness, and side effects of medication; and

(5) functional restrictions.[14] *Polaski*, 739 F.2d at 1322.

Here, the ALJ considered the *Polaski* factors at length and found that Plaintiff's

overall functioning in daily activities did not support Plaintiff's claims of disability. For

example, Plaintiff spent his days reading, watching television, cooking simple meals,

helping with small household chores, and using the computer for up to several hours a

day. The ALJ pointed out that Plaintiff can shop by himself and spends time with friends.

(Tr. 15–16.) Plaintiff does not challenge the ALJ's findings with respect to his daily

activities, but does challenge the ALJ's credibility ruling to the extent it was based on

discontinued treatment or noncompliance with treatment.

A plaintiff's failure to seek or comply with medical treatment can support a

negative credibility determination when the ALJ concludes that such medical treatment

would improve the plaintiff's impairments, unless the plaintiff had "good reason" for his

noncompliance. *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009); *see also* Social

Security Rulings ("SSR") 82-59, 1982 WL 31384, at *3–4 (Soc. Sec. Admin. 1982)

(detailing examples of good reasons for a social security disability claimant's failure to

follow prescribed treatment). The ALJ found, after reviewing all of the evidence, that

treatment of Plaintiff's insomnia and mental health issues may have likely increased

---

[14]     The ALJ need not explicitly "discuss each *Polaski* factor as long as 'he
acknowledges and considers the factors before discounting a claimant's subjective
complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v.
Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

Plaintiff's functionality, making him more capable of work. (Tr. 21.) In coming to this

conclusion, the ALJ considered evidence that Plaintiff was encouraged by medical

professionals to seek treatment for his stress and depression. (*See, e.g.*, Tr. 540.) The ALJ

also referenced Plaintiff's sporadic and discontinued treatment for his adhesive capsulitis,

CTS, and mental health issues, and noted Plaintiff's noncompliance with treatment for his

diabetes and pain management. (*Id.* at 14–15, 20–21.) In addition, the ALJ concluded that

the objective medical evidence supported Plaintiff's eligibility for MEDX spinal

rehabilitation, which he indicated would significantly improve the symptoms related to

claimant's neck and back pain. (*Id.* at 19, 409.)

Plaintiff argues the ALJ's reliance on his noncompliance with and discontinuation

of treatment and follow-up as reasons for rejecting his claim was erroneous because he

chose not to comply with and discontinued treatment due to cost, ineffectiveness, and

because he was attempting to treat his physical maladies, which he believed were the

cause of his mental health issues. (Compl. ¶¶ 7–10.) Plaintiff, however, misconstrues the

ALJ's findings. The ALJ did not identify failure to continue treatment as an indicator that

Plaintiff's claims were meritless. Instead, the ALJ pointed to the absence of

documentation noting consistent and continuous treatment of Plaintiff's ailments to

support the conclusion that "there is no evidence to support the 12-month durational

requirement for a finding of severe impairment." (Tr. 15.) Further, while the inability to

afford medical treatment may justify a failure to continue seeking treatment, a

"claimant's financial condition and real motivation for not seeking medical help are

questions of fact that are for the ALJ to decide." *Benskin v. Bowen*, 830 F.2d 878, 884,

885 n.1 (8th Cir. 1987). Moreover, discontinuation of treatment and failure to pursue

treatment were just two factors that the ALJ considered in his analysis of the case and

only part of the evidence that makes up the substantial evidence that supports the ALJ's

decision.

Finally, Plaintiff takes issue with the ALJ's reliance on his poor management of

his diabetes. (*See* Tr. 21.) Plaintiff asserts that his diabetes' symptoms remain unchanged

whether or not he monitors his glucose levels. (Compl. ¶ 10.) There is, however, no

medical evidence in the record to support this assertion. In fact, most references to

Plaintiff's diabetes in the medical record include notes by the treating physician

observing Plaintiff's sporadic monitoring and urging Plaintiff to better manage his

diabetes. (Tr. 385, 388, 460, 461, 517, 520.) "Impairments that are controllable or

amenable to treatment do not support a finding of disability, and failure to follow a

prescribed course of treatment without good reason can be a ground for denying an

application for benefits." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

Therefore, the ALJ correctly considered whether Plaintiff's noncompliance with his

diabetes management affected his claimed disability.

After reviewing the record evidence as a whole, this Court concludes that

sufficient evidence supports the ALJ's decision not to credit Plaintiff's subjective

complaints regarding his pain and symptoms based on Plaintiff's daily activities,

discontinuance of treatment, and noncompliance with treatment. *See Dodson v. Astrue*,

346 F. App'x 123, 124 (8th Cir. 2009) (holding that there was substantial evidence—such

as Plaintiff's reported daily activities, failure to comply with prescribed treatment, and

absence of restrictions ordered by a physician—to support the ALJ's negative credibility determination); *see also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the ALJ is in the best position to make credibility determinations and a court will defer to the ALJ's decision if supported by reason and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits Plaintiff's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.").

In conclusion, the ALJ was an adequate fact-finder who appropriately relied on the testimony of a vocational expert. There was a lack of objective medical evidence to support a finding that Plaintiff's claims of CTS, adhesive capsulitis, and mental health issues were severe impairments, and there was substantial evidence to support the ALJ's determination that Plaintiff was not credible in his subjective complaints of pain. Thus it was appropriate for the ALJ to find that Plaintiff was not precluded from performing his past occupations as a retail clerk or night auditor, and was therefore not disabled as defined under the Social Security Act. Accordingly, this Court recommends affirming the ALJ's determination.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 6) be **DENIED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 7) be **GRANTED**; and

3.     If this Report and Recommendation is adopted, that judgment be entered.


Date: June 19, 2015                          *s/ Becky R. Thorson*
                                              BECKY R. THORSON
                                              United States Magistrate Judge



**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b), a party may file and serve specific written objections to this Report and Recommendation by **July 3, 2015**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).